# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | |
|---|---|
| FCA US LLC, | Case No. 23-cv-05539 |
| Plaintiff, | |
| v. | Judge John J. Tharp, Jr. |
| THE PARTNERSHIPS AND UNINCORPORATED ASSOCIATIONS IDENTIFIED ON SCHEDULE "A", | Magistrate Judge Sheila M. Finnegan |
| Defendants. | |

## PRELIMINARY INJUNCTION ORDER

For the reasons set forth in the Statement of Reasons below, the Court grants plaintiff FCA US LLC's ("FCA") motion for preliminary injunction [30] in part, as to defendant ToolEpic and over ToolEpic's objection, as follows.

## STATEMENT OF REASONS

This is an online counterfeiting and trademark infringement dispute. ToolEpic is an online marketplace account that sells various goods on Amazon.com. One of those goods is an aftermarket gear shifter knob cover for various models of Dodge vehicles. The full name of the item is "TOOLEPIC for Scat Pack Accessories Dodge Challenger Charger Durango Accessory – Gear Shifter Knob Cover – ABS Plastic with Unique Style Surface, Perfect for Decoration – Jet Black" (the "Product"). ECF No. 37-1. A screenshot of ToolEpic's Amazon webpage for the Product is reproduced below:



ECF No. 37-1. A screenshot with a zoomed-in view of the Product is shown below:



ECF No. 37-1.

FCA, which owns the Dodge brand and several associated registered trademarks, filed the above-captioned lawsuit against ToolEpic and 120 other online marketplace accounts for trademark infringement and counterfeiting. It appended copies of several trademark registrations that the defendants identified on the Schedule A as allegedly infringing, including U.S.P.T.O. Reg. No. 4,696,903 (the "Scat Pack Bee" trademark), depicted below:



ECF No. 1-1.

FCA applied for and was granted an *ex parte* temporary restraining order against all defendants. The TRO enjoined the defendants from, among other things, continuing to advertise or sell goods using any of the FCA trademarks or transferring any money from their financial accounts, and it also ordered certain third parties, such as Amazon, to locate all funds and accounts connected to defendants' operations and freeze them. The TRO was in effect for 28 days.[1]

FCA sought the entry of a preliminary injunction upon the expiration of the TRO. ToolEpic objected to the entry of the preliminary injunction the day before the TRO expired. The Court entered the preliminary injunction, originally against all defendants, but the Court subsequently modified it to exclude ToolEpic in light of its objection. Following a hearing on ToolEpic's objection, however, the Court reinstated the original TRO as against ToolEpic pursuant to *H-D Michigan, LLC v. Hellenic Duty Free Shops S.A.*, 694 F.3d 827, 844-45 (7th Cir. 2012). ECF No. 44. In short, as it stands, ToolEpic's Amazon storefront remains frozen pending resolution of this motion as to ToolEpic.

The Court's task is to resolve whether, in light of the parties' submissions and the arguments set forth in the preliminary injunction hearing, there continues to exist a valid basis for preliminary injunctive relief against ToolEpic. In so deciding, the Court notes that awarding preliminary injunctive relief before the merits of a case have been decided "is an extraordinary

---

[1] As discussed *infra*, however, the Court later reinstated and extended the TRO beyond the statutory limit (in effect converting it to a preliminary injunction) pending resolution of the motion for preliminary injunction as to ToolEpic. *See* 10/4/23 Order, ECF No. 44.

remedy never awarded as of right." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008). As the party seeking entry of the preliminary injunction, FCA bears the burden of showing that it is warranted. It must show that it has a likelihood of succeeding on the merits, is likely to suffer irreparable harm in the absence of preliminary relief, the balance of equities tips in its favor, and the requested relief is in the public interest.[2] *Speech First, Inc. v. Killeen*, 968 F.3d 628, 638 (7th Cir. 2020), *as amended on denial of reh'g and reh'g en banc* (Sept. 4, 2020); *Mays v. Dart*, 974 F.3d 810, 818-22 (7th Cir. 2020).

## I.  Notice of Preliminary Injunction

In its opposition brief, ToolEpic states that FCA failed to provide ToolEpic with notice of the pending preliminary injunction motion against it, which is required by Fed. R. Civ. P. 65(a)(1) and the Court's TRO. According to ToolEpic, FCA served ToolEpic and the other defendants on September 14, 2023—the same day it filed the preliminary injunction motion—with a link to a webpage that only notified the defendants of a pending lawsuit against them, not a preliminary injunction specifically. Def.'s Resp. at 12, ECF No. 35. Upon inspecting the webpage, a copy of which ToolEpic attached to its opposition brief as Ex. 4 to the Decl. of Berkowitz, ECF No. 36-4, however, it appears that the web links to the motion for a preliminary injunction and the accompanying papers are noticeable. ToolEpic, therefore, has not successfully cast doubt on FCA's compliance with Rule 65(a)(1)'s and this Court's notice requirements.

## II.  Notice of Trademark Registration

During the preliminary injunction hearing, ToolEpic raised a notice issue different from the one concerning notice of the motion for preliminary injunction. Pursuant to 15 U.S.C. § 1111:

> a registrant of a mark registered in the Patent and Trademark Office, may give notice that his mark is registered by displaying with the mark the words "Registered in U.S. Patent and Trademark Office" or "Reg. U.S. Pat. & Tm. Off." or the letter R enclosed within a circle, thus ®; and in any suit for infringement under this chapter by such a registrant failing to give such notice of registration, no profits and no damages shall be recovered under the provisions of this chapter unless the defendant had actual notice of the registration.

According to ToolEpic, FCA has failed to show any evidence about how it displays the Scat Pack Bee mark in the real world, which necessarily means it hasn't met the registration notice requirement of § 1111.

The Court is not persuaded that this argument has any bearing on the propriety of a preliminary injunction. The Seventh Circuit has held that "§ 1111 does not create a defense; it is a limitation on remedies." *U.S. v. Sung*, 51 F.3d 92, 94 (7th Cir. 1995). The record at this juncture

---

[2] ToolEpic does not object to the entry of the preliminary injunction on the basis that it would not serve the public interest.

does not lend itself to a decision on the availability of monetary damages;[3] nor is the availability of that remedy relevant to the liability merits, irreparable harm, or balancing of the equities. "The holder of a mark is, however, under no legal obligation to give advance notice of its rights to an infringer before seeking damages or injunctive relief for infringement. The only consequence of a holder failing to give such notice is that damages might start running later than if the notice had been given." *Bambu Sales, Inc. v. Sultana Crackers, Inc.*, 683 F. Supp. 899, 911 (E.D.N.Y. 1988) (internal citation omitted).

### III. FCA's Likelihood of Succeeding on the Merits

The Seventh Circuit has explained that an applicant for preliminary injunction must make a "strong" showing of success—something less than proof by a preponderance but which "normally includes a demonstration of how the applicant proposes to prove the key elements of its case." *Illinois Republican Party v. Pritzker*, 973 F.3d 760, 763 (7th Cir. 2020). To succeed on the merits of its claim, then, FCA must make a strong showing that "(1) its mark is protectable and (2) the defendant's use of the mark is likely to cause confusion among consumers." *SportFuel, Inc. v. PepsiCo, Inc.*, 932 F.3d 589, 595 (7th Cir. 2019) (quoting *CAE, Inc. v. Clean Air Eng'g, Inc.*, 267 F.3d 660, 672 (7th Cir. 2001)). There is no dispute as to whether the Scat Pack image mark is protectable[4]—only whether ToolEpic's use is likely to cause confusion.

The Court finds that FCA has made a strong showing that ToolEpic's use of the Scat Pack Bee mark (Reg. No. 4,696,903) would likely cause confusion among consumers about the true source of the Product. *See AutoZone, Inc. v. Strick*, 543 F.3d 923, 930 (7th Cir. 2008) (In assessing likelihood of confusion, "[t]he court should . . . 'consider whether the customer would believe that the trademark owner sponsored, endorsed or was otherwise affiliated with the product.'" (quoting *Nike, Inc. v. "Just Did It" Enters.*, 6 F.3d 1225, 1228-29 (7th Cir. 1993))).

Courts in the Seventh Circuit "employ the following factors to evaluate whether a likelihood of confusion exists in a trademark case: (1) the similarity of the marks in appearance and suggestion; (2) the similarity of the products; (3) the area and manner of concurrent use; (4) the degree of care likely to be used by consumers; (5) the strength of the plaintiff's mark; (6) whether any actual confusion exists; and (7) the defendant's intent to palm off its goods as those of the plaintiffs." *Ty, Inc. v. Jones Group, Inc.*, 237 F.3d 891, 897 (7th Cir. 2001). "Even though no one factor is decisive, the similarity of the marks, the intent of the defendant, and evidence of actual confusion are the 'most important factors' in a likelihood of confusion case." *Id.* (quoting *G. Heileman Brewing Co., Inc. v. Anheuser-Busch, Inc.*, 873 F.2d 985, 999 (7th Cir. 1989)).

Many of the relevant factors militate toward a finding of likely confusion, at least at this preliminary stage. First, with respect to the similarity of the marks in appearance and suggestion,

---

[3] It is plausible, for example, that fact discovery will shed a light on the issue of whether "the defendant had actual notice of the registration," 15 U.S.C. § 1111, prior to being notified of this lawsuit.

[4] A registered mark is "prima facie evidence of the validity of the . . . mark . . . and of the registrant's exclusive right to use the mark in commerce." *Packman v. Chi. Tribune Co.*, 267 F.3d 628, 638 (7th Cir. 2001) (quoting 15 U.S.C. § 1057(b)).

perhaps the most important factor, FCA has shown that the marks are nearly identical. Therefore, that factor weighs heavily in favor of FCA. The Court also finds that the Scat Pack Bee mark, a relatively detailed cartoon image of a mechanized bee-racecar hybrid with a racing helmet and goggles, is quite strong based on its distinctiveness, heavy stylization, and fanciful nature. *See Sullivan v. CBS Corp.*, 385 F.3d 772 (7th Cir. 2004) ("The strength of a mark is determined partly by its classification. . . ."); *Zhang v. UAB Ekomlita*, No. 1:22-CV-05057, 2023 WL 2867798 (N.D. Ill. Apr. 10, 2023) (finding term "distinctive because it is a unique term with no independently recognizable meaning."); *Blau Plumbing, Inc. v. S.O.S. Fix-It, Inc.*, 781 F.2d 604, 610 (7th Cir. 1986) (widely used descriptive phrase is weak mark unworthy of trademark protection). Given the fancifulness of the logo, ToolEpic plainly could not have stumbled upon it by accident, a consideration which not only goes to strength of the mark but also bleeds into the defendant's intent.

At this preliminary stage, then, the most pertinent factors lean heavily toward confusion, and they make certain other factors (*e.g.*, intent to palm off or actual confusion) more likely to lean toward confusion as well—suffice to establish a reasonable likelihood of success by FCA. This is not changed by the fact that the defendant's own trademark, "ToolEpic," is displayed at the beginning of the Product's title. Even after considering that argument, FCA's showing of potential confusion remains substantial. Courts consider a prominent display of one's own trademark to be a strong indicator of lack of confusion where the defendant's own mark is well known. *See, e.g.*, *Sorensen v. WD-40 Co.*, 792 F.3d 712, 728 (7th Cir. 2015). If, hypothetically, ToolEpic were a better-known mark, it might dispel some of the confusion wrought by ToolEpic's use of FCA's for the Product. But "ToolEpic" is not a very well-known mark (at least it has not offered evidence to support that it is), and so, at this stage, the Court concludes that its presence would likely have little effect in dispelling consumer confusion in practice.

## IV.     Irreparable Harm

ToolEpic argues that, in the absence of concrete supporting evidence from FCA, the Court should not take FCA's conclusion that monetary damages would be insufficient at face value. But the Seventh Circuit has long recognized that there is a "well-established presumption that injuries arising from Lanham Act violations are irreparable, even absent a showing of business loss." *Abbott Laboratories v. Mead Johnson & Co.*, 971 F.2d 6, 16 (7th Cir. 1992); *Processed Plastic Co. v. Warner Commun., Inc.*, 675 F.2d 852, 858 (7th Cir. 1982) ("This and many other Courts have often recognized that the damages occasioned by trademark infringement are by their very nature irreparable and not susceptible of adequate measurement for remedy at law."). The presumption "is based upon the judgment that it is virtually impossible to ascertain the precise economic consequences of intangible harms, such as damage to reputation and loss of goodwill, caused by such violations." *Abbott*, 971 F.2d at 16.

ToolEpic has not succeeded in rebutting the presumption. It points to FCA's delay in bringing this action as evidence that it has not been subject to irreparable harm. But it has offered no reason to presume that there has been a delay; even if ToolEpic's Product has been on the market for over a year, there is no suggestion that FCA was aware of it well before commencing this litigation. In other trademark infringement cases, defendants have defeated the irreparable harm presumption by offering documentary evidence that the trademark holders "sat on" their decision to seek injunctive relief for many months after discovering potential violations. *E.g.*,

6

*Redbox Automated Retail, LLC v. Xpress Retail LLC*, 310 F. Supp. 3d 949, 953-54 (N.D. Ill. 2018) (rejecting a finding of irreparable harm where a trademark holder's interrogatory response indicated that the company had delayed in pursuing injunctive relief for over 18 months after first becoming aware of the potential infringement). In any event, the Product has been on the market for about a year—since October 2022. Def.'s Resp. at 9. Even if FCA had been made aware of the possible infringement immediately, such a delay of approximately eleven months would not **automatically** defeat a finding of irreparable harm. *See* J. Thomas McCarthy, 6 *McCarthy on Trademarks & Unfair Competition* § 31:31 (5th ed.) (survey concluding that outside the Second Circuit, "less than six months [of delay] was usually acceptable absent some strong prejudice to defendant; between six and 12 months, the decisions vary; and if the delay is greater than 12 months, preliminary injunctive relief is usually denied." (citing Sandra Edelman & Fara S. Sunderji, *Delay in Filing Preliminary Injunction Motions: 2015 Edition*, 105 Trademark Rep. 1012 (2015))).

## V.     Balance of Harms

Finally, the parties focus much of their attention on the balance of the harms. The Seventh Circuit has explained:

> [T]he more likely it is the plaintiff will succeed on the merits, the less the balance of irreparable harms need weigh towards its side; the less likely it is the plaintiff will succeed, the more the balance need weigh towards its side.

*Abbott*, 971 F.2d at 12.

As discussed, FCA has made a strong showing of the likelihood of success on the merits of its claim. Accordingly, the balance of irreparable harms need weigh less heavily toward its side than it would otherwise. But an accounting and balancing of the harms nonetheless leads the Court to conclude that a modified injunction is the equitable solution.

ToolEpic does not argue that preliminarily enjoining it from selling the Product is an undue hardship. Rather, ToolEpic contends that it would be drastically harmed by the continued asset freeze. "Without any ability to obtain funds from its Amazon account," it avers, "ToolEpic is essentially out of business—it cannot pay vendors or purchase new inventory." Def.'s Resp. at 11. It further contends that FCA has offered no evidence that ToolEpic poses a legitimate risk of transferring funds and avoiding a money judgment in this case simply because it is a foreign defendant. Unlike the many other anonymous foreign defendants in these types of cases, ToolEpic has not hidden its business name (Shenzhenshi qianhuiton shiye youxiangongsi) and business address from its Amazon webpage.

FCA, on the other hand, has evinced that it is regular practice for e-commerce stores like ToolEpic to evade anticipated and actual U.S. judgments against them. They do this by transferring money to offshore accounts. *See* Decl. of Gaudio at ¶¶ 6-10, ECF No. 15 (offering testimony about the prevalence of the phenomenon supported by review of financial account transaction logs, as well as collecting several cases in this District where such transfers were documented). The Court is inclined to recognize that such a risk exists in this case and warrants an asset freeze. It bears

explaining that this is not a matter of blindly equating ToolEpic's foreign-defendant status with a presumption of likely judgment evasion. Rather, the Court is acknowledging the reality that ToolEpic and similar entities—which are ***credibly*** accused of peddling counterfeit or IP-infringing goods on these third-party websites, likely to have ***no other identifiable assets*** within the reach of U.S. courts' jurisdiction, and capable of eluding collection of any judgments against them (in the absence of an asset freeze) while continuing to do business by simply creating new e-commerce storefronts under different aliases—pose a genuine and significant risk of engaging in said tactics.

Nonetheless, ToolEpic's objections about the magnitude of the harm its business likely to face are well taken. Freezing the store's entire business operations is unwarranted based on allegations about a single infringing product. As a general rule, prejudgment asset restraints are not permitted. *Grupo Mexicano de Desarollo, S.A. v. All. Bond Fund,* 527 U.S. 308 (1999). The relief FCA seeks includes equitable relief, however, and in *GMD* the Supreme Court "specifically noted that a restraint on assets was still proper if a suit sought equitable relief." *CSC Holdings, Inc. v. Redisi,* 309 F.3d 988, 996 (7th Cir. 2002). The equitable relief for the alleged infringement itself—an injunction against further infringement—does not authorize a prejudgment asset freeze, but section 35(a) of the Lanham Act also permits equitable relief in the form of an accounting of defendant's profits, 15 U.S.C. § 1117(a), and FCA expressly seeks an accounting of ToolEpic's profits. Accordingly, the TRO-cum-preliminary-injunction currently in place as to ToolEpic, ECF Nos. 22 and 44, will remain in effect; in light of the relatively low sale price of the product (about \$25[5]), and the data submitted by Plaintiff as to the number of infringing sales,[6] however, the scope of the asset restraint will be limited to \$25,000.[7]

## **PRELIMINARY INJUNCTION AND ASSET RESTRAINT ORDER AS TO TOOLEPIC**

For the foregoing reasons, this Court orders that:

1. Shenzhenshi qianhuiton shiye youxiangongsi, d/b/a ToolEpic (hereafter, "ToolEpic"), its officers, agents, servants, employees, attorneys, and all persons acting for, with, by, through, under, or in active concert with it be preliminarily enjoined and restrained from:

    a. using FCA's trademark registered as USPTO Registration Number 4,696,903 (hereafter, "FCA Trademark") or any reproductions, counterfeit copies, or colorable imitations in any manner in connection with the distribution, marketing, advertising, offering for sale, or sale of any product that is not a genuine FCA product or not authorized by FCA to be sold in connection with the FCA Trademark;

---

[5] *See* ECF No. 37-2 at 4 (FCA citing data from Amazon indicating that 979 infringing items had been sold for a total of \$25,604). This corresponds closely to the evidence submitted by FCA as to ToolEpic's offering the allegedly infringing product for \$23.99.

[6] *See* note 5.

[7] Under section 35(a), plaintiffs need only prove sales; defendants bear the burden to prove costs and other deductions to revenues from gross sales to arrive at "profits" rather than revenues.

b. passing off, inducing, or enabling others to sell or pass off any product as a genuine FCA product or any other product produced by FCA, that is not FCA's or not produced under the authorization, control, or supervision of FCA and approved by FCA for sale under the FCA Trademark;

c. committing any acts calculated to cause consumers to believe that ToolEpic's products are those sold under the authorization, control, or supervision of FCA, or are sponsored by, approved by, or otherwise connected with FCA; and

d. manufacturing, shipping, delivering, holding for sale, transferring or otherwise moving, storing, distributing, returning, or otherwise disposing of, in any manner, products or inventory not manufactured by or for FCA, nor authorized by FCA to be sold or offered for sale, and which bear any of FCA's trademarks, including the FCA Trademark, or any reproductions, counterfeit copies, or colorable imitations.

2. ToolEpic shall not initiate any transfers or transactions that would deplete the collective balance of the financial accounts and funds restrained by this order below $25,000.

3. Upon FCA's request, ToolEpic and any third party with actual notice of this Order who is providing services for ToolEpic, or in connection with any of ToolEpic's Online Marketplaces, including, without limitation, any online marketplace platforms such as eBay, Inc., AliExpress, Alibaba Group Holding Ltd. ("Alibaba"), Amazon.com, Inc., ContextLogic Inc. d/b/a Wish.com ("Wish.com"), and Dhgate (collectively, the "Third Party Providers"), shall, within seven (7) calendar days after receipt of such notice, provide to FCA expedited discovery, limited to copies of documents and records in such person's or entity's possession or control sufficient to determine:

    a. the identities and locations of ToolEpic, its officers, agents, servants, employees, attorneys, and any persons acting in active concert or participation with them, including all known contact information and all associated e-mail addresses;

    b. the nature of ToolEpic's operations and all associated sales, methods of payment for services, and financial information, including, without limitation, identifying information associated with the Online Marketplaces and ToolEpic's financial accounts and ToolEpic's sales and listing history related to its Online Marketplaces; and

    c. any financial accounts owned or controlled by ToolEpic, including its officers, agents, servants, employees, attorneys, and any persons acting in active concert or participation with it, including such accounts residing with or under the control of any banks, savings and loan associations, payment processors or other financial institutions, including, without limitation, PayPal, Inc.

("PayPal"), Alipay, Wish.com, Alibaba, Ant Financial Services Group ("Ant Financial"), Amazon Pay, or other merchant account providers, payment providers, third party processors, and credit card associations (e.g., MasterCard and VISA).

4. Upon FCA's request, those with notice of this Order, including the Third Party Providers as defined in Paragraph 3, shall within seven (7) calendar days after receipt of such notice, disable and cease displaying any advertisements used by or associated with ToolEpic in connection with the sale of counterfeit and infringing goods using the FCA Trademark.

5. Any Third Party Providers, including PayPal, Alipay, Alibaba, Ant Financial, Wish.com, and Amazon Pay, shall, within seven (7) calendar days of receipt of this Order:

   a. locate all accounts and funds connected to ToolEpic's seller aliases, including, but not limited to, any financial accounts connected to seller alias TOOLEPIC Products, amazon.com/sp?seller=AEK7FA9CTHC6V, the e-mail address(es) identified in Exhibit 2 to the Declaration of Thomas H. Hipelius as belonging to ToolEpic, and any e-mail address(es) provided for ToolEpic by third parties; and

   b. restrain and enjoin any such accounts or funds belonging to ToolEpic from engaging in any transfers or transactions that would deplete the collective balance of any and all such accounts and funds below $25,000 until further order by this Court.

6. FCA may provide notice of the proceedings in this case to ToolEpic, including service of process pursuant to Fed. R. Civ. P. 4(f)(3), and any future motions, by electronically publishing a link to the Pleadings, this Order, and other relevant documents on a website and by sending an e-mail with a link to said website to the e-mail addresses identified in Exhibit 2 to the Declaration of Thomas H. Hipelius and any e-mail addresses provided for ToolEpic by third parties.

7. Any third party impacted by this Order may move for appropriate relief.

8. The $121,000 bond posted by FCA shall remain with the Court until a final disposition of this case or until each Preliminary Injunction in this case is terminated.

   SO ORDERED:

Date: October 20, 2023

John J. Tharp, Jr.
United States District Judge